# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs November 4, 2014

## STATE OF TENNESSEE v. NICO FARMER

**Appeal from the Criminal Court for Shelby County**
No. 12-00036     Chris Craft, Judge

**No. W2013-02736-CCA-R3-CD  - Filed January 23, 2015**

The defendant, Nico Farmer, was convicted by a Shelby County Criminal Court jury of felony murder and attempted aggravated assault, a Class D felony, and was sentenced to consecutive terms of life and eight years.  He raises four issues on appeal:  (1) whether the evidence is sufficient to sustain his convictions; (2) whether the trial court erred in ruling that his prior aggravated robbery convictions could be used to impeach his testimony; (3) whether the trial court erred by not charging the jury on self-defense; and (4) whether the trial court imposed an excessive sentence by enhancing his sentence for attempted aggravated assault and ordering that the sentences be served consecutively.  Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which THOMAS T. WOODALL, P.J., and ROBERT L. HOLLOWAY, JR., J., joined.

Robert Parris, Memphis, Tennessee, for the appellant, Nico Farmer.

Herbert H. Slatery, III, Attorney General and Reporter; David H. Findley, Senior Counsel; Amy P. Weirich, District Attorney General; and Alanda Dwyer, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTS

Early on the morning of October 6, 2011, the murder victim, Antonio Pierce, was walking home from a Memphis nightclub with his friends, Nicole Farmer and Tommy Ray Williams, when he and Farmer were accosted by two men, one of whom demanded money

and then fired multiple gunshots at Pierce, who died of his injuries. A neighbor who was looking out his window at the time identified the gunman as the defendant. The Shelby County Grand Jury subsequently returned a two-count indictment charging the defendant and a co-defendant, Terry Johnson, with the first degree felony murder of Pierce and the attempted aggravated robbery of Farmer. The co-defendant died sometime after the indictment was returned, and the defendant proceeded to trial alone in October 2013.

## Trial

Arbory Pierce, the father of Antonio Pierce, identified a photograph of the victim and testified that he passed away on October 6, 2011.

Nicole Farmer[1] testified that at approximately 3:00 a.m. on October 6, 2011, she was walking home from a neighborhood nightclub, "Hey Baby," with Antonio Pierce and Tommy Ray Williams. Williams had just separated from her and Pierce to continue on his separate way home when two men came up behind her and Pierce and said, "Y'all know what it is," which, she said, meant that it was a robbery. She said she turned around, began backing up, and said to one of the two men who had a gun, "Baby, I ain't got nothing." She stated that the gunman was approximately 5'6" or 5'7" tall, had a reddish, light-skinned complexion, and was taller than the second, dark-skinned, unarmed man. Both men were dressed all in black and had their faces and heads covered so that only their eyes were visible. The gunman pointed his gun directly at her for several seconds and then turned to Pierce and shot him.

Farmer testified that she froze after the gunman shot Pierce but that Williams, who had been crossing the street, ran back and grabbed her and the two of them fled together toward a store on Eldridge Street. She said she started to call the police on her phone, but they arrived before she could make the call. She heard more gunshots and looked back to see Pierce getting up from the ground and running toward an apartment complex with the two assailants chasing him. She heard multiple additional gunshots as she continued her flight from the area. She later returned to the apartment complex, saw the victim lying on the ground with his shirt covered in blood, held his hand, and asked him who had done this to him. The victim replied, "Nicky, I know who did it because they tried to rob me once before."

Tommy Ray Williams testified that when he, Pierce, and Farmer reached the corner of Hunter and Springdale on their walk home from the nightclub, he crossed the street to

---

[1]Victim Nicole Farmer is no relation to the defendant, Nico Farmer. For simplicity's sake, we will refer to the defendant as "the defendant," Nicole Farmer as "Farmer," and the murder victim, Pierce, as "the victim."

head toward Hyde Park while Pierce and Farmer started toward the apartment complex. Just before he stepped up onto the opposite curb, he heard gunshots and looked back to see Farmer standing frozen in place as if in shock. He ran back across the street and grabbed Farmer by the arm to pull her away from the area. Pierce was lying on the ground at first but then got up and started running, chased by the individuals who had been shooting. Williams said he heard three or four gunshots while Pierce was still on the ground and five or six additional gunshots after he got up and began running away. It was dark in the area, and he was unable to see the shooters. He said that neither he nor his two companions, Farmer and Pierce, had a gun. He stated that the police arrived just as Farmer was about to call them. At that point, Farmer walked back to the apartment complex area and, after hesitating "for a little bit," he followed her. By the time he arrived, the victim was already in an ambulance.

Officer Eric Hutchison of the Memphis Police Department's Crime Scene Unit identified photographs he had taken of the crime scene, including one from a balcony overlooking the area where some blood and a number of shell casings were located. He said the area at the entrance to the apartments, including the scene from the balcony, was "well-illuminated" by "fixed lighting from the apartment complex."

Oscar Ellis, a resident of the Cypress Garden Apartments, testified that he worked at a neighborhood grocery on Springdale and was familiar with both the victim and the defendant as customers of the store. He said that he was watching television in the living room of his second floor apartment at about 3:00 a.m. on October 6, 2011, when he heard several gunshots, looked out his front window, and saw two people running. He also heard someone yelling for help. When the first figure reached the light, he recognized the victim fleeing down the driveway. He then saw a second running man slow to a stop, step off a curb, and fire two or three shots at the victim. Ellis testified that the gunman initially had his shirt pulled up over his mouth and a "hoodie" pulled down over his head but that the hood came partially off as he ran, exposing his "dreds," and that his shirt dropped from his mouth when he stopped to shoot. The area was well-lit, and he had "no trouble at all" recognizing the gunman as the defendant, whom he had seen on at least four or five previous occasions. Ellis testified that he saw a third individual who went "the other way" from the victim and the defendant, staying behind some bushes. Because of the obstructed view, all he could tell about that person was that his or her complexion was darker than the defendant's.

Ellis testified that he got dressed, called 911, and went outside to wait for the officers. He said he saw Farmer talking to the victim, who was lying in the road, and overheard the victim say, "I'm going to get them. I know them. I'm going to get them." Ellis stated that the police later contacted him and took him downtown to view a photographic array, from which he identified the defendant as the shooter. He explained that he wrote on the array that he was ninety percent sure that the defendant was the shooter, despite the fact that he was

-3-

actually one hundred percent certain, because he lived in a rough neighborhood, was scared, and "didn't want to get involved." However, there was "no doubt" in his mind that it was the defendant he saw that night. On cross-examination, Ellis reiterated that he was absolutely certain of his identification.

Officer George Cave of the Memphis Police Department's Felony Response Unit testified that he was sent to the city hospital, "The Med," in the early morning hours of October 6, 2011, in connection with the investigation of a gunshot victim, Terry Johnson, who had shown up at the hospital at about the same time that the victim arrived. He stated that Johnson, who had a medium to dark complexion, appeared to have sustained a "through-and-through gunshot wound" to the leg. He said that Johnson was transported to the Homicide Bureau, where he was photographed. He identified photographs of Johnson, including one depicting that Johnson had a tattoo of the name "Duke" on his left arm.

Raphael Ellis, who said he was no relation to Oscar Ellis, testified that he turned himself into the police on October 11, 2011, because he had five warrants, including ones for aggravated assault, theft of property, and violation of probation. On October 14, 2011, he pled guilty to violation of probation, was sentenced to the Shelby County Correctional Center, and left the jail the next morning. He did not know the defendant before October 11 when he entered the jail and had not seen him again after he left the jail on October 15 until the date of the trial.

However, during the time that he was in the Shelby County Jail, he and the defendant were housed close to each other and struck up an acquaintance. Over the course of several conversations, the defendant divulged to him that he was being held on a first degree murder charge and related what had happened. According to the witness, the defendant told him that he and his "charge partner," "Duke," had been at Club Hey Baby, where "Duke" had spotted the victim. "Duke" told the defendant that the victim had a lot of money and asked the defendant if he wanted to rob the victim. The defendant eventually agreed, and he and "Duke" trailed the victim when he left the club. When they reached the corner, the defendant pulled his gun on the victim and demanded his money. The victim, who was larger than the defendant, began grabbing at the defendant and the defendant got scared, stepped back, and began firing. In the process, the defendant shot not only the victim but also "Duke," who had been standing beside the victim trying to get his money out of his pockets. "Duke," who had been shot in the leg, began yelling, and two of the defendant's other "partners," "Jessie and Arli," pulled up in a vehicle. The defendant told "Arli" to take "Duke" to the hospital, and he and "Jessie" ran around the corner to someone's house.

The witness testified that the defendant also told him that a gun the police recovered when they arrested him was not the gun he used in the robbery. According to the witness,

-4-

the defendant told him that he had destroyed with a hammer the gun that he used to shoot the victim. The witness testified that he had asked for his probation to be reinstated in exchange for his testimony against the defendant and identified a "memorandum of understanding" between himself and the assistant district attorney, which stated that he agreed to provide truthful testimony in exchange for the State's taking his cooperation into consideration in determining the proposed disposition of any pending charges and not opposing his request to have the remainder of his sentence suspended.

On cross-examination, the witness acknowledged that he had been "desperate" to get out of jail at the time he spoke to the prosecutors about what the defendant had divulged. He further acknowledged that he had been granted probation very shortly after he spoke with the prosecutor. He explained that, in his extensive jail experience, it was common for inmates to talk to each other about their pending charges and cases and to seek advice from each other on what to do. Finally, he testified that the defendant did not have dreds when he was at the jail.

Shelby County Deputy Public Defender Sherrye Brown, who represented Raphael Ellis at the time he was housed in the jail with the defendant, testified that her client wanted to give his statement about what the defendant had divulged because he wanted out of prison to help care for his family. Ultimately, she reached an agreement with the prosecutor that her client would testify truthfully in exchange for the State's not opposing his request for probation. In addition, the prosecutor agreed to let whichever prosecutor handled her client's pending cases know about her client's cooperation in the defendant's case. However, no promises were made with respect to her client's pending charges. On cross-examination, she conceded that her client's cooperation in the defendant's case helped him succeed in his request for probation.

Lieutenant Michaele Byers of the Shelby County Sheriff's Office, the keeper of the jail records, testified that the defendant and Raphael Ellis were both booked into the jail on October 11, 2011, were together in the intake area on October 11, and were housed together in Lower Level H from October 11 to October 15, 2011.

Dr. Miguel Laboy, the medical examiner who performed the autopsy of the victim's body, testified that the thirty-five-year-old, 6'2", 221-pound victim, who was shot seven times, died of multiple gunshot wounds. The victim's blood tested positive for oxycodone but negative for alcohol or any other drugs.

Quatisha Monds, the defendant's sister-in-law, testified on the defendant's behalf that the defendant at one time wore his hair in dreds but had cut them off in March 2011. On cross-examination, she testified that she had not seen the defendant after May 2011.

Tanesha Harris, the defendant's friend, testified that she saw the defendant approximately two to three times a week, including during September and October of 2011. She said the defendant cut his dreds off in "[m]aybe [the] spring of 2011" and from that time forward wore a "low haircut." On cross-examination, she testified she did not know the exact date that the defendant cut his dreds.

The defendant elected not to testify and rested his case without presenting any further proof. Following deliberations, the jury convicted him of felony murder as charged in the indictment and of the lesser offense of attempted aggravated assault, and the defendant was sentenced to life for the murder conviction.

## Sentencing Hearing

The State introduced certified copies of the defendant's three aggravated robbery convictions, as well as his presentence report, which reflected that he had a substantial criminal record, had been on parole at the time the instant offenses were committed, and had previously failed to comply with a sentence of probation. In addition, the State presented the testimony of two officers with the Shelby County Sheriff's Department Gang Intelligence Unit, Officers Ruben Ramirez and Kenneth Boykin, that the defendant admitted to and was "very vocal" about his active membership in the 87 Kitchen Crips gang, had numerous gang-related tattoos identifying himself as a Kitchen Crip, and had been involved in a gang-related incident at the jail in March 2012, which resulted in his relocation.

At the conclusion of the hearing, the trial court found the following applicable enhancement factors: the defendant has a previous history of criminal convictions or behavior in addition to those necessary to establish his range; the defendant was a leader in the commission of the offense; the defendant, before trial or sentencing, failed to comply with the condition of a sentence involving release into the community; the defendant possessed a firearm during the commission of the offense; and the defendant committed the offense while released on parole. Tenn. Code. Ann. § 40-35-114(1), (2), (8), (9), (13) (2014). Finding no applicable mitigating factors, the trial court sentenced the defendant as a Range II offender to eight years for the attempted aggravated assault conviction, the maximum sentence in his range.

The trial court ordered that the defendant serve his eight-year sentence for attempted aggravated assault consecutively to his life sentence for felony murder based on its finding that the defendant was a professional criminal who had devoted his life to criminal acts as a major source of his livelihood, was an offender whose record of criminal activity was extensive, and was a dangerous offender whose behavior exhibited little or no regard for human life. Tenn. Code Ann. § 40-35-115(b)(1), (2), (4) (2014). The trial court further

found that confinement for an extended time was necessary to protect the public from the defendant and that the aggregate length of his sentences was reasonably related to his offenses. See State v. Lane, 3 S.W.3d 456, 460-61 (Tenn. 1999); State v. Wilkerson, 905 S.W.2d 933, 937-38 (Tenn. 1995).

## ANALYSIS

### I. Sufficiency of the Evidence

The first issue the defendant raises on appeal is whether the evidence is sufficient to sustain his convictions. Specifically, he contends that the evidence is insufficient to establish his identity. In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The defendant asserts that his convictions are based on "unreliable eyewitness identification and testimony from a jail house informant who had a motive to lie in order to procure his early release from a prison sentence." In support, he cites, among other things, the felony record of Raphael Ellis and the fact that Oscar Ellis was only ninety percent certain in his initial identification to police and consistently stated that the shooter wore his hair in thick dreds, which contradicted the testimony of the defense witnesses that the defendant had cut his hair in March 2011 and wore a "low haircut" at the time of the shooting. The State argues that the jury was entitled to accredit the testimony of the witnesses "as it saw fit" and that the evidence was sufficient for the jury to find that the defendant committed the crimes. We agree with the State.

Viewed in the light most favorable to the State, the evidence showed that the defendant and Johnson, who believed Pierce to have a large amount of cash, followed Pierce, Farmer, and Williams from the nightclub with the intention of robbing them, that the defendant pointed his gun at Farmer as he announced that it was a robbery, and that the defendant then fired multiple gunshots at Pierce, striking him seven times and causing his death. Oscar Ellis, whose courtroom identification of the defendant as the shooter was unequivocal, explained that his fear and reluctance to get involved in the case was the reason that he initially told police that he was only ninety percent certain in his identification. He also explained his familiarity with the defendant and how both the defendant's hood and shirt had fallen part of the way down, making it easy for him to recognize him in the well-lit area in which he stopped to shoot the victim. As for Raphael Ellis, the jury heard of his prior convictions and how he was motivated to testify against the defendant by his desire to have his probation reinstated. The jury also heard his testimony that, in his experience, it is common for jail inmates to talk to each other about their pending charges and cases. We agree with the State that there was sufficient evidence from which the jury could find beyond a reasonable doubt that the defendant was the gunman who attempted to rob Pierce and Farmer and shot and killed Pierce during the course of that attempted robbery. We conclude, therefore, that the evidence is sufficient to sustain the defendant's convictions.

## II. Impeachment Evidence

The defendant next contends that the trial court erred in ruling that his prior convictions for aggravated robbery could be used to impeach his credibility. Specifically, he argues that the court conducted an improper Rule 609 analysis because, although it concluded that the convictions were probative of his credibility, it did not determine whether the probative value of the convictions outweighed their prejudicial effect. The State argues that the trial court made the required findings under Rule 609 and acted within its discretion in ruling that the State could use the convictions for impeachment purposes. We agree with the State.

A conviction may be used to impeach the testimony of an accused in a criminal prosecution if the following four conditions are satisfied: (1) the conviction is for a crime punishable by death or imprisonment in excess of one year, or the conviction is for a misdemeanor which involved dishonesty or false statement; (2) less than ten years has elapsed between the date the accused was released from confinement and the commencement of the subject prosecution; (3) the State gives reasonable pretrial written notice of the particular conviction or convictions it intends to use as impeachment; and (4) the trial court concludes that the probative value of the prior conviction on the issue of credibility outweighs its unfair prejudicial effect on the substantive issues. Tenn. R. Evid. 609; State v. Mixon, 983 S.W.2d 661, 674 (Tenn. 1999).

Two factors should be considered when deciding whether the probative value of a prior conviction outweighs its unfair prejudicial effect. Mixon, 983 S.W.2d at 674. First, "[a] trial court should . . . analyze the relevance the impeaching conviction has to the issue of credibility." Id. (citation omitted). Second, if the trial court finds that the prior conviction is probative of the defendant's credibility, then the court should "'assess the similarity between the crime on trial and the crime underlying the impeaching conviction.'" Id. (quoting Neil P. Cohen et al., Tennessee Law of Evidence § 609.9 at 376 (3d ed.1995)). The more similar the impeaching conviction is to the offense for which the defendant is on trial, the greater the risk of a prejudicial effect to the defendant. Id.

A trial court should make findings on the record when deciding whether to admit a prior conviction for the purposes of impeachment:

> Tennessee case authority strongly urges judges to explicitly state, on the record, their reasons for allowing or disallowing a criminal conviction to be used for impeachment under Rule 609. The trial court should carefully explain any balancing of factors. Without this record, it will be difficult for appellate courts to determine whether the balancing test was properly applied.

Neil P. Cohen et al., Tennessee Law of Evidence § 6.09[14][b] (5th ed. 2005) (footnotes omitted).

This court reviews a trial court's ruling on the admissibility of prior convictions for impeachment purposes under an abuse of discretion standard. See State v. Waller, 118 S.W.3d 368, 371 (Tenn. 2003).

The trial court ruled that the State could impeach the defendant with his convictions for aggravated robbery, despite the similarity to the crimes for which he was on trial, because aggravated robbery was "so probative of his honesty or dishonesty." Although its

analysis of this issue was very brief, we find no abuse of discretion in the trial court's ruling in this matter. Robbery is a crime of dishonesty and, as thus, probative of credibility. See State v. Goad, 692 S.W.2d 32, 37 (Tenn. Crim. App. 1985); State v. Caruthers, 676 S.W.2d 935, 941 (Tenn. 1984). Moreover, "[t]he fact that a prior conviction involves the same or similar crime for which the defendant is being tried does not automatically require its exclusion." State v. Welcome, 280 S.W.3d 215, 222 (Tenn. Crim. App. 2007) (citations omitted). Implicit in the trial court's ruling is a finding that the probative value of the convictions on the defendant's credibility outweighed the prejudicial effect of introducing evidence of crimes similar to the ones for which he was on trial. We, therefore, conclude that the trial court did not abuse its discretion in ruling that the State could use the defendant's aggravated robbery convictions to impeach his credibility.

### III. Self-Defense

The defendant next contends that the trial court erred by not charging the jury on self-defense. He argues that his small stature in relation to the victim, combined with the account he provided to Raphael Ellis of having fired his gun because he became scared when the victim grabbed at him, was sufficient evidence to warrant an instruction on self-defense. The State responds that the trial court correctly ruled that an instruction was not warranted under the facts, where the proof was that the victim was unarmed and the defendant was engaged in unlawful activity at the time of the shooting. We, again, agree with the State.

"It is well-settled in Tennessee that a defendant has a right to a correct and complete charge of the law so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." State v. Farner, 66 S.W.3d 188, 204 (Tenn. 2001) (citing State v. Garrison, 40 S.W.3d 426, 432 (Tenn. 2000); State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990)). Accordingly, trial courts have the duty to give "a complete charge of the law applicable to the facts of the case." State v. Davenport, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998) (citing State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986)). "In determining whether a defense instruction is raised by the evidence, the court must examine the evidence in the light most favorable to the defendant to determine whether there is evidence that reasonable minds could accept as to that defense." State v. Sims, 45 S.W.3d 1, 9 (Tenn. 2001). "When the entire charge, read as a whole, fully and fairly sets out the applicable law, the trial judge does not err in denying a special instruction requested by a party or in denying an inaccurate instruction or one inapplicable to the case at hand." Id.

Tennessee's statute on self-defense provides in pertinent part:

[A] person who is *not engaged in unlawful activity* and is in a place where the

person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:

(A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;

(B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and

(C) The belief of danger is founded upon reasonable grounds.

Tenn. Code Ann. § 39-11-611(b)(2) (emphasis added).

The evidence at trial was that the unarmed victim was shot while the defendant was attempting to rob him. As such, self-defense was not raised by the proof. We conclude, therefore, that the trial court did not err in denying the defendant's request for a jury instruction on self-defense.

## IV. Sentencing

Lastly, the defendant contends that the trial court imposed an excessive sentence by enhancing his sentence for attempted aggravated assault and by ordering that his sentences be served consecutively. We respectfully disagree.

Under the 2005 amendments to the sentencing act, a trial court is to consider the following when determining a defendant's sentence and the appropriate combination of sentencing alternatives:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the

courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

Tenn. Code Ann. § 40-35-210(b) (2014).

The trial court is granted broad discretion to impose a sentence anywhere within the applicable range, regardless of the presence or absence of enhancement or mitigating factors, and "sentences should be upheld so long as the statutory purposes and principles, along with any enhancement and mitigating factors, have been properly addressed." State v. Bise, 380 S.W.3d 682, 706 (Tenn. 2012). We review a trial court's sentencing determinations under an abuse of discretion standard, "granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Id. at 707.

The record reflects that the trial court properly considered the relevant purposes and principles of the Sentencing Act and imposed a sentence within the applicable range for the defendant's Class D offense of attempted aggravated assault. As for the imposition of consecutive sentencing, Tennessee Code Annotated section 40-35-115(b) provides that it is within the trial court's discretion to impose consecutive sentencing if it finds by a preponderance of the evidence that *any one* of a number of criteria applies, including the three found by the trial court in this case. The record, again, reflects that the trial court considered and applied the relevant law and made the requisite findings of fact in support of its ruling. Accordingly, we find no abuse of discretion in the sentencing imposed by the trial court.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE